

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

Friday, July 10, 2015

*Via EFC*
Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:  *United States* v. *Cheryl O'Connor*,
          13 Cr. 288 (JGK)

Dear Judge Koeltl:

      The Government respectfully submits this letter in connection with the defendant's sentencing and in response to the defendant's request that the Court not impose a sentence within the stipulated guideline range identified in her plea agreement (24 to 30 months imprisonment), but rather, to impose a non-custodial non-Guideline sentence pursuant to 18 U.S.C. § 3553(a).  The Government objects and requests that the Court impose a sentence of imprisonment within the Stipulated Range (24-30 months) for the reasons identified by the Probation Office at pages 25-27 of the May 5, 2015 Presentence Investigation report (PSR) under the heading "Justification" and as set forth herein.[1]  Additionally, as discussed below, the Government requests that the Court impose a lump sum restitution payment order in the amount of $183,488, the restitution amount the defendant agreed to pay the IRS in the plea agreement.[2]

---

[1]  To the extent the updated PSR could be read to suggest this Court should be guided by the sentence Judge Patterson announced (but did not finalize) during the sentencing hearing on February 3, 2015, the Government disagrees.  As a *de* novo sentencing, it is appropriate that this Court  -- as it indicated it intended to do during our last appearance in this matter -- "make [its] own determinations as to all aspects of the sentencing decision" without any deference to the sentence mentioned by Judge Patterson. *United States v. Hernandez,* 2012 WL 335771, 460 Fed.Appx. 18 (2d Cir. Feb. 3, 2012).

[2]  According to the Updated PSR dated May 5, 2015, the defendant has cash on hand in the amount of  $185,149.54 in accounts at HSBC Bank. (PSR ¶ 63).

## Offense Conduct

The defendant Cheryl O'Connor, as the owner of a tax return preparation business Technical Support II (TSII) that she operated out of her residence in the Bronx, New York, prepared numerous false tax returns for the 2007 through 2009 tax periods resulting in substantial Federal and State tax losses.  For the years 2007 through 2009, O'Connor prepared and filed more than 3,000 tax returns on behalf of TSII clients. (PSR ¶ 6).

In preparation of the Special Agent's Report for the prosecution of O'Connor, the IRS determined that O'Connor falsified at least 60 federal individual income tax returns on behalf of 21 taxpayer clients, resulting in a tax loss to the federal government of $184,338 and to the State of New York of $56,831. Subsequent audits of other O'Connor clients identified an additional $115,001 federal tax loss, for a total tax loss of $390,540. (PSR ¶ 6).

The IRS interviewed 21 of O'Connor's client-taxpayers and collectively they described a process in which they went to the apartment O'Connor worked out of in the Bronx, waited their turn to be seen by her, handed her their W-2, and rarely any other documentation, and then sat while she worked on her computer. Then with very little discussion, she would inform them of the amount of tax refund they could expect, but did not otherwise discuss with her client's their tax returns or what information she was putting on their returns.  Moreover, the clients were not provided with a copy of their returns until they came back a few weeks later to pick up their refund checks. (PSR ¶ 7).

O'Connor's business electronically filed all the completed returns. The fraudulent items reported on the returns were very similar and included false Schedule A expenses such as gifts to charity and unreimbursed employee business expenses. The false items also included head of household status, education credits for non-qualifying taxpayers and substantial expenses on forms Schedule C (Profit or Loss from a business). (PSR ¶ 8).

## IRS Undercover Visit to O'Connor's Apartment

On March 10, 2011, an IRS Undercover Agent (the "UC") went to O'Connor's Apartment and posed as a taxpayer seeking to have his 2010 federal and state tax returns prepared.  The UC entered O'Connor's Apartment wearing a concealed recording device, which recorded audio and video during the UC's

appointment. (PSR ¶ 9). Attached as Exhibit A, is a draft transcript of the UC's interaction with the Defendant.

Initially, Brigit Myles, O'Connor's adult daughter who worked for O'Connor as a receptionist, greeted the UC at the entrance. Myles greeted the numerous tax return clients the UC observed coming into and then leaving O'Connor's Apartment during the time he was there. While waiting to be seen by O'Connor, the TSII clients were directed by Myles to take a seat in a small room just inside the entrance to O'Connor's Apartment. When the UC first arrived at O'Connor's Apartment, there were approximately one-half dozen clients ahead of him. (PSR ¶ 9).

When it came to the UC's turn to have his tax return prepared, Myles directed him into a second larger room of the apartment that appeared to be a combination kitchen and living room. In this second room, the video shows that O'Connor was seated behind a desk, which had two computers, an open laptop computer, and a desktop computer with a monitor. Myles directed the UC to take a seat in front of O'Connor's desk. When he sat down, the UC handed O'Connor his Form W-2 (the federal tax form issued by employers and stating how much an employee was paid in a year and how much was withheld by the employer for federal, state and local income and employment taxes). O'Connor took the UC's W-2 and using the desktop computer, entered the figures from the W-2 into a computer tax form. As evident from the transcript, other than asking if the UC had any dependents, O'CONNOR did not make any inquiries of the UC, nor did the UC volunteer anything regarding possible deductions to be included in the UC's tax returns. Instead, O'Connor and the UC exchanged pleasantries while O'Connor focused her attention on the computer screen in front of her and on phone calls she made while working on the UC's tax return. Despite the absence of any discussion regarding the UC's actual expenses and deductions, the finished tax return O'Connor prepared for the UC included itemized deductions totaling $18,642.00 on Schedule A of the UC's form 1040. Attached as Exhibit B, is a redacted copy of the UC's return prepared and submitted by O'Connor. (PSR ¶ 10).

A properly prepared return, based only upon the W-2 provided by the UC, should have resulted in a tax due and owing; instead, the return prepared for the undercover agent by O'Connor generated a refund of $4,905. In particular, the return listed Employee Business Expenses totaling $3,636.00; a $4,000.00 deduction for charitable contributions made by means other than by cash or by

check to the Salvation Army; and a $7,094.00 deduction for charitable donations made by cash or check. (PSR ¶ 10).

When O'Connor finished up with the UC's tax return, she informed him that he was getting a refund of $4,905, and directed him toward her daughter to pay on his way out.  Notably, O'Connor did not go over the UC's return with him, nor even print out a copy and provide it to him.  Instead, the UC had to make a special request for a copy of his return as it was clear that O'Connor was not providing copies when she finished up with each client.  The UC's experience in this regard was consistent with what the IRS would learn later from the O'Connor clients it interviewed, *i.e.,* that they were only given copies of their returns *after* the returns had been filed and they came back to pick up their refund checks from O'Connor's office, usually two weeks later.  After the UC's visit to O'Connor's Apartment, the IRS Service Center confirmed that on or about March 16, 2011, the returned prepared for the UC by O'Connor was received by electronic transmission to the IRS. (PSR ¶ 11).

The UC's experience with O'Connor, along with the details of the false deductions included on the six sample tax returns in the Information (PSR ¶ 1), belies defendant's attempt to downplay her crime where she claims in her sentencing submission to this Court:

> These are the facts of Ms. O'Connor's crime.  There were certainly instances where she claimed deductions *due to ignorance and lack of specific training – not knowing for example, that expenses for hobbies could be deducted in only very limited circumstances.*

July 2, 2015 Letter to the Court, Florian Miedel, p. 4.  There was nothing complicated to figure out about the wrongfulness of O'Connor's inclusion of thousands of dollars of fabricated Schedule C losses and thousands of dollars of non-existent charitable donations on her client's tax returns.  These were the false deductions that drove this fraud, not "hobby" deductions.

### The Bureau of Prisons Can Adequately Treat O'Connor

With respect to the defendant's request for a below guideline sentence because of her medical condition, the Second Circuit has advised that the key question for the Court to consider regarding medical and psychological conditions in the context of sentencing, is whether the Bureau of Prisons (BOP) has the ability to adequately treat the defendant's condition. *United States* v. *Cutler*, 520 F.3d 136

(2d Cir. 2008), *called into question on other grounds by United States* v. *Cavera,* 550 F.3d 180, 189 (2d Cir. 2008); *accord United States* v. *Workman,* 602 Fed.Appx. 13, 115 A.F.T.R.2d 2015-991 (2d Cir. Mar. 2, 2015). In reversing the District Court's granting of a downward departure in *Cutler* due to the defendant's health, the Second Circuit found that that the District Court had erroneously assessed the medical evidence and that there was no support in the record for the District Court's view that the BOP could not care for the defendant's medical condition. Moreover, the Second Circuit addressed the importance that the record reflects such evidence before it is considered in sentencing:

> [i]f there is evidence to support a finding that the BOP is incapable of providing prompt response to inmates' emergency medical needs, its disclosure is not only essential to the sustainability of the findings in this case, it is essential for the avoidance of unwarranted disparities among similarly situated defendants; and it is in the best interest of a humane society that any such evidence be disclosed.

*United States* v. *Cutler*, 520 F.3rd at 175.

In light of the information in the attached letter from the BOP (Exhibit C, BOP June 2, 2014 Letter) concerning the defendant's condition and the BOP's ability to adequately treat that condition, the Government does not believe the defendant's condition should provide any basis for mitigation of her sentence.

### The Court Should Impose a Sentence within the Stipulated Range

In pleading guilty, the defendant agreed that the applicable range within which the Court could sentence her was 24-30 months. Exhibit D (O'Connor Plea Agreement, executed April 8, 2013). Although the defendant requests that she be given a non-custodial sentence pursuant to 18 U.S.C. ¶ 3553(a), the Government disagrees. As pointed out by the Probation Office in its "Justification" section in support of its recommendation that the Court impose a 24-month prison sentence, the instant offense represents the third felony conviction for this 61-year-old defendant, and concerns O'Connor defrauding the Internal Revenue Service of $183,488. From 2007 to 2009, O'Connor prepared and filed more than 3,000 income tax returns. At least 60 of the federal income tax returns she filed on behalf of TSII clients contained fraudulent deductions that resulted in the clients improperly receiving tax refund checks. (PSR Dated May 5, 2015, p. 25).

Moreover, in seeking a non-custodial sentence, while O'Connor acknowledges that her criminal conduct had a "devastating effect" on herself and her family, September 30, 2013 Letter to the Court from Florian Miedel, p. 3., O'Connor fails to comprehend the damage she did to her clients by dragging them (without their knowledge or consent) into her crimes and by submitting fraudulent tax returns in their name. [3] As the facts of this case demonstrate, it is all too easy for a crooked tax return preparer to insert fraudulent deductions into their client's tax returns to generate large refunds to keep their ignorant clients coming back year after year.  In a perfect world, our tax code would be simple enough so that everyone could understand it.  Unfortunately, it is complicated and that is why people hire tax return preparers like O'Connor, because they do not understand the ins and outs of the tax code.  And while such clients surely know that a deduction for a donation to a charity that they did not make does not belong on their return, when a tax preparer, like O'Connor, never goes over the return with the client, it is not clear the client would ever notice that one line in what ends up being a stack of papers provided to them only *after* the returns had been electronically submitted, and they had received their refunds.

Accordingly, because of the circumstances of her crimes and the need for general deterrence of other similarly situated income tax return preparers, the Court should sentence the defendant to a prison term within the stipulated range of 24-30 months.

### The Court Should Order a Lump Sum Restitution Payment

Pursuant to Title 18, United States Code, Section 3664, the Court has discretion to order that restitution be paid in "[a] single, lump-sum payment, [or] partial payments at specified intervals." According to the PSR, the defendant has cash on hand in the amount of $185,149.54 in accounts at HSBC Bank. (PSR ¶ 63). Yet, without any discussion of the financial information submitted by the defendant, the Probation Office included its boilerplate periodic payment schedule of 15% of the defendant's gross monthly income. (See PSR at p. 28).  This was despite the fact the defendant has no income of her own and is being supported by her husband.  Accordingly, such a payment schedule is not appropriate here, and

---

3  The Government believes that O'Connor's clients were essentially ignorant of the wrongfulness of what O'Connor was doing and if they did realize at some point that she had put something false on their returns, it was only after O'Connor had submitted the return electronically to the IRS.  PSR ¶11.

the Government submits that the Court should order the defendant to pay the full amount of restitution to the IRS immediately in a lump-sum payment.

Although the defendant's attorney advised the Government that they would object to a lump sum restitution payment, his previous letter to the Court assumed that the defendant's "old age savings" would be used to satisfy the restitution she agreed to pay in connection with her guilty plea, *see* September 30, 2013 Letter to the Court from Florian Miedel, p. 3.  In any event, in connection with restitution issues, "[t]he burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents, shall be on the defendant," 18 U.S.C. § 3664(e), and there is no evidence that the defendant needs those funds to live on as the PSR indicates that she is being supported by her husband and that they are living within their means.  *See* PSR ¶ 63. [4]

---

[4]   Even if the defendant claims now that her circumstances have changed since she submitted her financial information to Probation, the Court should still enter the lump sum order because the Court retains jurisdiction to modify the payment schedule to address "any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution." 18 U.S.C. § 3664(k); *see also United States* v. *Jaffe*, 417 F.3d 259, 267 (2d Cir. 2005) (noting that "the district court retains jurisdiction to amend or adjust the restitution order if there is any material change in [the defendant's] economic circumstances").  Nor would this be different even if she has dissipated some of her assets.  *United States* v. *Nachamie*, 93 Fed.Appx. 293, 2004 WL 605270, at *1 (2d Cir. 2004) (unpublished) (Modification of restitution order, requiring, *inter alia*, that the defendant make an immediate lump sum payment of $60,000, was not warranted based upon reduction of defendant's gross assets from $182,100 at sentencing to $67,000, where such reduction was based in part upon defendant's dissipation of assets).

**Conclusion**

        For the reasons stated above, and based upon the stipulations in the plea agreement, the Court should sentence the defendant within the stipulated sentencing range, 24-30 months, and should order that the defendant pay restitution to the IRS in the amount of $183,488, the restitution amount the defendant agreed to pay in the plea agreement.  Finally, the Government requests that the Court ordered that the restitution to the IRS be paid immediately in a lump sum.


                    Respectfully submitted,

                    PREET BHARARA
                    United States Attorney
                    Southern District of New York


        By:   *Robin W. Morey*

                    ROBIN W. MOREY
                    Assistant United States Attorney
                    (212) 637-2196
                    robin.morey@usdoj.gov


Enclosures:     Exhibits A-D
cc :            Florian Miedel, Esq. *via ECF*

EXHIBIT A

Unreviewd Draft Transcript          For Discussion Purposes Only          Pre-Indictment Discovery

DATE:  MARCH 10, 2011

******** [this part of the transcript begins at approximately 13:36, Video starts earlier]

O'Connor:      Did I see you last year?

U/C Agent:     No, I came here with my friend.  I worked off the books last year.

O'Connor:      Good Morning.  What do you do?  Security.

U/C Agent:     Yeah, I do Security.  I'm sorry. I didn't unders-------.  I do Security.

O'Connor:      Birthdate.

U/C Agent:     September 9, 1980 – 09-09-1980, I don't know if you (Chuckles).

O'Connor:      What's your phone number?

U/C Agent:     Um, [redacted number].  2109.  Got it!

O'Connor:      Um hum.

U/C Agent:     I was saying 80-1980-80.

O'Connor:      Your older.

U/C Agent:     Yeah. (Chuckles)

O'Connor:      Your older huh, but your younger.

U/C Agent:     Way (Chuckles). I wish.  Good old days.

O'Connor:      All these people back think they know what you know.  That's a waste of time.

U/C Agent:     Exactly.  That is true.  That is true.

O'Connor:      Dependent.

U/C Agent:     Say that again.

O'Connor:      Dependent.  Got a dependent?

Unreviewd Draft Transcript          For Discussion Purposes Only          Pre-Indictment Discovery

U/C Agent:   No

O'Connor:    OK.  That's alright.  I'm not pushy.

U/C Agent:   (Chuckles)

O'Connor:    Put that the next thing on your list.

U/C Agent:   Oh Yeah Aah.  Let me know.  You know it's rough out there man.  As long as she nice and simple, were good to go.  (Chuckles)

O'Connor:    You got to go on Facebook.

U/C Agent:   Oh yeah, I don't know even that's becoming a issue, now a days. You know.  You see a picture of a female, it turns out to be a guy.  You never know.  (Chuckles).  I don't trust all that online stuff.  People don't talk no more  You know.

O'Connor:    I run into a lot of relatives I didn't know I had.  I found this person who lives in Kingston.

U/C Agent:   Really, and you met them on Facebook?

O'Connor:    Yes.

U/C Agent:   That's far enough, right?

O'Connor:    And it turns out that her mother was my Grandmother's sister.

U/C Agent:   What! Isn't that crazy though?

O'Connor:    Yeah, but that makes her a relative don't it?

U/C Agent:   Oh yeah, without a doubt.  Ha ha ha.  So you plan on visiting her? (Chuckles).

O'Connor:    I'd like to.

U/C Agent:   I hear you.  Wow!  That'll be something.  That's crazy though.  Mmm.  You originally from here or abroad?

O'Connor:    She's from umm Jamaica.

U/C Agent:   Oh in Jamaica.  Oh are you Jamaican?

O'Connor:    I guess so.

Unreviewd Draft Transcript        For Discussion Purposes Only        Pre-Indictment Discovery

U/C Agent:   (Chuckles) right, Ahh geez.  Here you go.  That is true.  That's funny.

O'Connor:   (Inaudible) Jamaican, too.

U/C Agent:   Exactly right.

O'Connor:   If her, If her, If her, If her Grandmother was my Grandmother's sister, that means I'm Jamaican, don't it.

U/C Agent:   Exact, exactly.  (Chuckles).  That's all it is.  Nice.

O'Connor:   Oh God.  Like my boyfriend try to making fun of Jamaican people.

U/C Agent:   (Inaudible) Like look that's my people, right there.  Right.  (Chuckes) exactly.

O'Connor:   Whoa, Whoa, Whoa, Whoa, Whoa, Whoa, Whoa, talking bout all those coconuts.  I said what.

U/C Agent:   Exactly. Ha ha ha.  Nice.

O'Connor:   He said are you Jamaican?  Come here.

U/C Agent:   Exactly.  He won't forget that now though.  Ha ha ha ha.

O'Connor:   He said I thought you were American.  I said I'm Jamerican.

U/C Agent:   There you go.  Jamerican.  Ha ha.  There you go.  Nice.  That's one place I definitely want to visit.  I gotta visit.

O'Connor:   I went there with my husband's cousin.  We had too many hands.

U/C Agent:   (Chuckles).  Too many.  (Chuckles).

O'Connor:   Too many.

U/C Agent:   Oh man.

O'Connor:   Talking bout umm family (Inaudible)  Nah man me not, me not play that much.

U/C Agent:   Exactly.  (Chuckles).  I hear you.  That's funny.

O'Connor:   She's like where'd you get that accent from.  Me not know.

3

U/C Agent:    Me not know.  Mon.  (Chuckles).

O'Connor:    Sometimes I (Inaudible) and sometimes I don't.

U/C Agent:    Sometimes you don't, right?

Door Bell

U/C Agent:    (Inaudible) I got you.  (Chuckles).  I been doing it all day.  I got used to it.  Might as well, might  as well.  Ah hey, exit for you.  (Chuckles).

Man:    Sorry about that (Inaudible) yeah.

U/C Agent:    Figure I might as well, you know.  (Chuckles).

Man:    Get em out.

U/C Agent:    (Chuckles).

O'Connor:    I decided to lock the door because people (Inaudible).  You didn't knock on my door (Inaudible) right?

U/C Agent:    No, I didn't.  I just knocked and waited.  Oh, oh.

O'Connor:    Because the bell's right there.

U/C Agent:    Yeah, yeah.  That's even when they were asking me to open up.   Oh that's not my door, you know.  My parents told me don't open other people door.  (Chuckles).

O'Connor:    (Inaudible).

U/C Agent:    Yes,  (Chuckles), so I had to wait for you to tell me the second time to go open it.  I was like all right.

O'Connor:    When you sit by the door, you become the door monitor.

U/C Agent:    Right, right. (Chuckles).  That is true.  Oh, it seen very laid back.  I like the view.  A good view out there.

O'Connor:    (Inaudible) because (Inaudible).

U/C Agent:    Oh for real.  (Chuckles).

O'Connor:    On a clear day you can see (Inaudible).  (Chuckles)

4

Unreviewd Draft Transcript          For Discussion Purposes Only          Pre-Indictment Discovery

| | |
|---|---|
| U/C Agent: | No, I don't mean that that not bad.  Look at that.  You could always call in with the traffic (Door Bell) let them know when it's backed up.  (Chuckles).  Open up the Bruckner. |
| O'Connor: | On a clear day, you can see traffic on the bridge. |
| U/C Agent: | Umm, that's not bad. |
| O'Connor: | Call Traffic.com |
| U/C Agent: | Um hum.  They got a full house today. |
| O'Connor: | I know. |
| U/C Agent: | Everybody's gotta get their due.  (Chuckles). |
| O'Connor : | (Inaudible) nobody (Inaudible). |
| U/C Agent: | Oh, I forgot to give you this.  Want me to hold that for you?  You got it?  Break that up. |
| O'Connor: | OK, you (Inaudible). |
| U/C Agent: | Yeah, everybody, everybody always (Inaudible) at me.  (Chuckles).  No problem. |
| O'Connor: | (Inaudible). |
| U/C Agent: | Um hum. |
| O'Connor: | OK, ok.  (Inaudible). |
| O'Connor: | Me not know. |
| U/C Agent: | (Chuckles). |
| O'Connor: | (Inaudible) you don't know when (Inaudible). |
| O'Connor: | These people have an answering machine.  What's wrong with them? |
| U/C Agent: | What they do?  Keep transferring you from machine to machine.  (Chuckles).  The worst. |
| O'Connor: | (Inaudible) Account number (Inaudible) number. |

U/C Agent:   That's a different keyboard.  I never seen that before.  That's nice.  You probably wash it off or something.  That's crazy, nice.  That's crazy .  What's that rubber.  Oh wow.  (Chuckles).  Oh shoo.  That's crazy.  I never seen nothing like that.

O'Connor:   Nope.  Nobody. (Inaudible)

U/C Agent:   (Chuckles).  Everybody's over here trying to be health conscious.  (ChuckleS)  Just turn your back and watch.  (Chuckles).

O'Connor:   Not offhand, but I can give you my phone number 718-542-4996.  OK.  718-542-4996.  Yes, Technical Support Services.  OK.  This morning I called in because I lost the file and first I had to have a reindex and then I had to wait for it to reindex and now I can't access any of their files.  I can't, I can't upgrade em.  OK, (inaudible), Um hum (Inaudible)

U/C Agent:   (Inaudible) can be good.  (Chuckles).

U/C Agent:   You still hanging on.  (Chuckles).

O'Connor:   (Inaudible) nothing.

U/C Agent:   Really it's a sign.  They don't want to talk to nobody.  Ah geez.  The call is probably going overseas.  (Chuckles).

O'Connor :   Yes, I'm here.  Hello, what's your name.  Hello (Inaudible) I'm here.  (Inaudible).  Hello.  OK.  Let me tell you what happened today.  Umm.  I lost the file or the system ate the file and I was trying to refind it and when I, I put it in it said that when I was trying to save it, it said that it already existed.  I want to override it.

O'Connor:   So I figured if it overrides, I should be able to re, you know, open it up another way, but I couldn't so what I end up doing is the maintenance on the, the system.  I'm going to have to reindex all the files, all 811 of them and on my umm on my home base.  I have to redo each, you know, individually to for analysis and when I try to do that, it won't go.  It won't let me do that.

O'Connor:   It says no, no new status information.  We have no new status information at this time, please check the status again in 24 hours.  I've got too many people calling for status and there's nothing on my, on, on, on the, umm, the bank card, it says nothing there and I'm supposed to be getting checks today.  If you (Inaudible) the system.  Please do (Inaudible).

O'Connor:   (Inaudible) you.

U/C Agent:   Um hum.

O'Connor :   And your refund is 4 thousand nine hundred five.

U/C Agent:   So is that.

O'Connor:   Federal.

U/C Agent:   Alright.  Alright then.  (Inaudible) for the return alright.  Good.  I can go buy the house I wanted.  (Chuckles).

O'Connor:   (Chuckles).  I know a girl that was buying houses like that in, in, in Vegas.

U/C Agent:   Really?

O'Connor:   Yeah, in Vegas.

U/C Agent:   Oh yeah, yeah, I have a buddy that live out there and he said it's, you know, it's cheaper, it's not New York City, you know, it's not, cheaper.

O'Connor:   Yeap.

U/C Agent:   Alright, thanks.  Thank you.

O'Connor:   You know I forgot to (Inaudible)              .

U/C Agent:   Must be my bank account number.

O'Connor:   OK.

U/C Agent:   Yeah, no rush, no rush.

O'Connor:   OK.  I go to home base and I do what.  On help.  Ok. Ok.  (Inaudible) go through.

O'Connor:   561.  Excuse me.  Repeat that again, please.

O'Connor:   OK.  Thank you.  I'm running.

U/C Agent:   I'm running.  (Chuckles).

O'Connor:   Here you go.  Ok.  I'm waiting for you now.

U/C Agent:   That's cool.  (Chuckles).

O'Connor:   That's not a question you ask me.

U/C Agent:   (Chuckles).  Nice.  (Chuckles).  I see where your mind is going.  (Chuckles).

O'Connor:   (Chuckles).

U/C Agent:   Nice.  (Chuckles).

O'Connor:   Excuse me.  None of them pending.  Most of them.

O'Connor:   If (Inaudible) I (Inaudible) I've done a whole lot of them.  I have 811 or more now and I have to update them.  (Inaudible) here.  That's not right.

O'Connor:   Oh, now it's working.  Thank you.

O'Connor:   (Inaudible) I was pushing the wrong button.  I wasn't pushing it using that (Inaudible).  I panicked.

U/C Agent:   Um hum hum.

O'Connor:   OK.  Thank you very much.

O'Connor:   The file that I initially wanted to, to retrieve didn't get, didn't come back, so I had to do it all over again, from, and that took 32 minutes out of the day.  OK.  Thank you very much.  No, if not, I'll call back, um huh, ok thank you.

U/C Agent:   Um hum hum.

O'Connor:   There in Missouri and it's cold.

U/C Agent:   Oh Missouri, that's where the call.  Wow, yeah, it would be cold there.  (Chuckles).

O'Connor:   No snow.

U/C Agent:   All right.

O'Connor:   But it was, it was cold.

U/C Agent:   Ahh, geez.

O'Connor:   That's not saying nothing, because it's cold here, too.

U/C Agent:   I know right, (Chuckles), where isn't it cold.  (Chuckles).  Ahh, man.

O'Connor:   Um um, accepted.  OK I'm good.

8

Unreviewd Draft Transcript        For Discussion Purposes Only        Pre-Indictment Discovery

U/C Agent:    Alright.  (Chuckles).

Man's Voice:  Larry (Inaudible)                    .

O'Connor:    (Inaudible) like (Inaudible) years ago.  Hi Larry.  I'm doing ok.  You can't find the guy with the kid.  So, I guess you, so I guess you don't have one.

U/C Agent:    (Chuckles).

O'Connor:    OK, so keep looking.  Um hum, yeah, you got, you got to April 15th.  Ok. Ok. bye, bye.

U/C Agent:    You should have told Larry to go start working, you know, he still got nine months.  (Chuckles).  Nah.  I'm joking.

O'Connor:    (Chuckles).  No, but that would be for next year.

U/C Agent:    Oh, alright, alright, oh, yeah, yeah, yeah, that's it, yeah, oh yeah, that's true.  I wasn't thinking.

O'Connor:    Then you gotta do that before April.

U/C Agent:    Oh yeah. That wouldn't make sense then, that's true, good call, good call. (Chuckles).

O'Connor:    You gotta get that before April or it won't happen            .

U/C Agent:    It won't happen.  Gotcha!

O'Connor:    (Inaudible).                              .

U/C Agent:    Yeah, that's the account number.  That's the routing number.

O'Connor:    That's the Social?

U/C Agent:    Yeah.

O'Connor:    21 00023.

U/C Agent:    Or it could.  Alright.

O'Connor :    What's the routing number?

U/C Agent:   I had em for a long time.  That's probably why.  (Inaudible) no money in it. (Chuckles).  (Inaudible) that's true because I do have another account with that same number.  I just remember the 8 but.

O'Connor:   [redacted ss number].

U/C Agent:   [redacted ss number].  Yep.

O'Connor :   That's Chase, my favorite bank.

U/C Agent:   Yeah, they're.  I like them.  They're good.  They're customer service is good, too.

O'Connor :   Yeah, they, they, they                  .

U/C Agent:   Yes, there you go most importantly.  (Chuckles).  That is true.

O'Connor :   I work Chase.

U/C Agent:   (Chuckles).  There you go.  Oh, you work there?

O'Connor :   No, I work for them.

U/C Agent:   Oh you work.  Oh.  What you mean?  You mean um they work for you. (Chuckles).

O'Connor :   Yeah.

U/C Agent:   Oh, alright, alright.

O'Connor :   I work them.

U/C Agent:   There you go.  (Chuckles). Nah they good though.  They good.

U/N Woman 2:      Hi Terrial.  Uh, this is me Docia.  Uh, I called the (Inaudible).  Uh somebody said, I don't know, my Godson might have to call Carmen.  And I spoke to you too.  I just called the IRS.  They said you made the mistake, that you have to use OMORR, but you used BADCA.  So, please try and give me a call (Inaudible).  Thank you.

O'Connor:   What she say?

U/C Agent:   (Chuckles).  Yeah, I know.  (Chuckles).  I heard OMRR and that's it.  I know, right.  I heard OMRR.  That's it. (Chuckles).

Unreviewd Draft Transcript          For Discussion Purposes Only          Pre-Indictment Discovery

O'Connor:       Look, I transfer it from last year. It was the same. I did not change her name. So if it worked last year, I don't know why it didn't work this year.

U/C Agent:      (Chuckles).

O'Connor:       Got that.

U/C Agent:      There you go. (Chuckles).

O'Connor:       Me not know.

U/C Agent:      (Chuckles). Me not know. (Chuckles). Nice.

O'Connor:       OK, Where's your W2?

U/C Agent:      Ahh, you have it.

O'Connor:       Oh.

U/C Agent:      Oh, had me worried. I don't remember taking it out.

O'Connor:       Not to worry, mon.

U/C Agent:      There you go. Exactly. No problem. (Chuckles).

O'Connor:       No problem. (Chuckles). Take this to Bridget.

U/C Agent:      No problem. Aah well. Thank you. Its been a pleasure.

O'Connor:       You welcomed. Ok, next. I got a list, but I don't know who is on it.

U/C Agent:      I had to come to see (Inaudible). I was going to stick everything (Inaudible). That's fine. Let me look.

Door Bell

Woman:          I was getting ready to put it in here. I, was like, let me look in here.

U/C Agent:      (Chuckles). Good call. (Chuckles)

Woman:          (Inaudible).

U/C Agent:      Yeah. Oh, that's true.

Myles:          (Inaudible). When I was home is was like, I'm going to sleep. I was (Inaudible). No, I'm going to sleep.

Unreviewd Draft Transcript          For Discussion Purposes Only          Pre-Indictment Discovery

U/C Agent:    Sleep.  Yeah. Sleep.  Right, geez. (Chuckles).

U/C Agent:    Sign my life away.

Myles:        Yeap.

U/C Agent:    That's it.

Myles:        That's it.  Now being that this year she going paperless, I need your e-mail address.

U/C Agent:    Alright. Oh.

Myles:        Your name and your e-mail address.

U/C Agent:    Will do.  So there's no way for me to get a copy.  I need to like.

Myles:        (Inaudible) asked her.  You should have asked her already.

U/C Agent:    Oh no.  I didn't know.  I thought that was it right there.  Someone could do, umm, get a copy from um.

Myles:        (Inaudible) for you today.

U/C Agent:    Alright, alright.

Myles:        You need one. You need.

U/C Agent:    I was going to try to drop it off at the office today, at least.  Ask her.  Um hum.  Just like the IRS taking my money.  (Chuckles).

U/C Agent:    Taking my money like the IRS.

Myles:        Oh no, no, no.

U/C Agent:    Nah.  I'm teasing.  (Chuckles).

Myles:        (Inaudible).

U/C Agent:    I hear ya, two (Inaudible).

U/C Agent:    You said $120.  Hey Cheryl.  She only hears who she want to hear. Maybe I should walk over there.  Excuse me.  (Chuckles).  I did say that. Excuse me.  Sorry to bother you.  Like I don't have manners.  (Chuckles). Can I get a copy?  I have to submit student loan for whatever.

Unreviewd Draft Transcript        For Discussion Purposes Only        Pre-Indictment Discovery

O'Connor:        (Inaudible).

U/C Agent:       I wish I could (Inaudible).  They probably look at me and ask what I'm doing.

U/C Agent:       Still raining.

O'Connor:        Um hum.

U/C Agent:       Gotta love New York.

O'Connor:        Is there any other place you'd rather be?

U/C Agent:       Say that again.

O'Connor:        Is there any other place you'd rather be?

U/C Agent:       Oh.  On a island, No. (Chuckles).  We were just talking about that, right?

O'Connor:        (Inaudible)

U/C Agent:       There you go (Inaudible).

O'Connor:        No.

U/C Agent:       (Inaudible).

O'Connor:        (Inaudible) I had a great time then I have timeshare.

U/C Agent:       Oh, there you go.  Way to do though.  Yeah, timeshare good when you have it forever, rather than a week.  Is that it, is that all I need..

O'Connor:        Um hum.

U/C Agent:       Thank you.  Appreciate that (Inaudible).  (Chuckles).

U/C Agent:       Shred this.

Myles:           (Inaudible) I have one.  Where's the oth, where's the other one.

U/C Agent:       It should be.  Which other one.

Myles:           I have.

U/C Agent:       No, that's not mine.  That's not mine.

Unreviewd Draft Transcript          For Discussion Purposes Only          Pre-Indictment Discovery

Myles:          (Inaudible).

U/C Agent:   It should be no color.

Myles:          OK.

U/C Agent:   Yeah woman

U/C Agent:   (Chuckles).  Just giving me random things.  (Chuckles).  I'm teasing.
                    (Chuckles), no problem, appreciate that.  (Inaudible) put the wedding and
                    everything and have any ideas for the honeymoon.  The whole world.
                    (Chuckles).

Myles:          We were going to do (Inaudible) local.

U/C Agent:   Alright.  Alright.  Nice.

Myles:          (Inaudible).

U/C Agent:   (Chuckles).

Myles:          (Inaudible).

U/C Agent:   Really pricey.  (Chuckles).  No (Inaudible).  It's nice on the beach.

Myles:          (Inaudible).

U/C Agent:          (Inaudible) you know the whole setup with the food (Inaudible).
What.  Nice.

Myles:          Cheaper than doing it (Inaudible).

U/C Agent:   Really.  I don't believe that.  Really, wow.  I'm figuring you say a couple
                    thousand, easy.  Really.

Myles:          We're debating like if we did a whole wedding (Inaudible) in a hall.

U/C Agent:   Yeah.

Myles:          The decorating (Inaudible).

U/C Agent:   Umm hmm.

Myles:          And I invited like 30 people.

14

U/C Agent:     That's a good number especially going flying to a different country
               Nice.  So fine.

Myles:         (Inaudible).

U/C Agent:     (Chuckles).  There you go.

Myles:         (Inaudible).

U/C Agent:     That's not bad.  I mean not for a ridiculous number for a wedding.  That's
               just like food alone is probably 6.  That's not bad. Wow.  Nice.  Cool.  You
               got a plan.  You got it figured out.  Smart woman.  (Chuckles).

Myles:         Yeah.

U/C Agent:     Nice.  Congrats though.  Alright.  Yeah, yeah.

Myles:         If I did it here and I invited more people, it would be about

U/C Agent:     Half a million.  Nah.

Myles:         No, no, no.  It could be a nice one for about 20.

U/C Agent:     You think so.

U/C Agent:     That's still a lot though, you know.

Myles:         I wasn't trying to do no more that 20.

U/C Agent:     Yeah, it's one day outside (Inaudible) things you could have done with that
money.  (Chuckles).

Myles:         Yeah (Inaudible).

U/C Agent:     Oh, here you go.  Especially if you have a house.   Alright (Inaudible)
               whatever alright.  Thanks a lot.  Cool, cool.  Good luck.  Oh yeah, don't get
               too stressed out.  (Chuckles).  I heard it gets crazy.  Next thing I see you
               again with an afro.  (Chuckles).

Myles:         You have too many people.  You have to make sure you know what you
               want.

U/C Agent:     Um hum.  Right.

Myles:         Exactly what you want.

U/C Agent:     Right.

Myles:         And you can't let, you can't let the people, eh, dictate to you.  Whoever is going to be your wedding planner.

U/C Agent:     Right.  Right.

Myles:         You want to make sure that they accept (Inaudible) and you don't want to have to come back and have to (Inaudible).

U/C Agent:     Right, because it's your wedding right not nobody.

Myles:         Right.

U/C Agent:     Right.  Cool, cool.  Good luck, nah, no problem.  Take care.  Take care everybody.  Have a good one.  Thank you.

U/C Agent:     Sorry.  Sorry bout that.

U/C Agent:     Hey.

U/C Agent:     Ehh.  I should be downstairs in about a minute.  Alright.  I should be downstairs in about a minute.  Alright, man.

U/C Agent:     Take care.

[video recording continues as UC is picked up]
*********.